UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

UNITED STATES OF AMERICA,          :     17-cr-003 (JGK)

      v.                           :

JASON KATZ,                       :

                Defendant.    :
----------------------------------------------------------------x

## SENTENCING SUBMISSION OF JASON A. KATZ

Robert Knuts
Michael Tremonte
Allegra Noonan
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
Fax: 212.202.4156
E-mail: rknuts@shertremonte.com

*Attorneys for Jason Katz*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND .............................................................................................. 2

I.     Personal History and Characteristics ................................................................. 2

II.    Charges and Plea Allocution ............................................................................. 14

III.   Mr. Katz's Extraordinary Cooperation with the Government .......................... 14

IV.   Guidelines Calculation and Probation's Recommendation of Time-Served ................... 16

ARGUMENT ..................................................................................................................... 17

I.     Legal Standard ................................................................................................... 17

II.    The § 3553(a) Factors Support Probation's Recommended Sentence of
Time-Served ...................................................................................................... 18

       A.    Mr. Katz's Extraordinary Cooperation Merits Leniency ...................... 18

       B.    Mr. Katz Has Already Suffered Serious Punishment for His Actions ................. 19

       C.    The Need for Specific and General Deterrence Weighs Against
Imposition of an Incarceratory Sentence ............................................. 21

       D.    A Sentence of Time-Served Is Necessary to Avoid Unwarranted
Sentencing Disparities Across Similar Cases ...................................... 22

CONCLUSION .................................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
    552 U.S. 38 (2007) .......................................................................................... 17, 18

*Koon v. United States*,
    518 U.S. 81 (1996) ............................................................................................... 17

*Pepper v. United States*,
    562 U.S. 476 (2011) ...................................................................................... 17, 18

*United States v. Doe*,
    323 F. Supp. 3d 368 (E.D.N.Y. 2018) ............................................................... 22

*United States v. Emmenegger*,
    329 F. Supp. 2d 416 (S.D.N.Y. 2004) ............................................................... 22

*United States v. Gaind*,
    829 F. Supp. 669 (S.D.N.Y. 1993) .................................................................... 22

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012) ............................................................... 22

*United States v. Mullings*,
    131 F. Supp. 3d 1 (E.D.N.Y. 2015) ................................................................... 21

*United States v. Singh*,
    877 F.3d 107 (2d Cir. 2017) ............................................................................... 18

*United States v. Stewart*,
    590 F.3d 93 (2d Cir. 2009) ................................................................................. 21

*United States v. Thavaraja*,
    740 F.3d 253 (2d Cir. 2014) ............................................................................... 17

*United States v. Wills*,
    476 F.3d 103 (2d Cir. 2007) ............................................................................... 23

**Statutes**

15 U.S.C. § 1 ................................................................................................................. 14

18 U.S.C. § 3553(a) ............................................................................................... *passim*

**Rules**

U.S.S.G. § 2R1.1 ............................................................................................................ 16

U.S.S.G. § 3E1.1 ............................................................................................................ 16

## PRELIMINARY STATEMENT

Mr. Katz's cooperation over the span of nearly four years has been nothing short of extraordinary.  The government describes Mr. Katz's cooperation as "essential" to the successful prosecution of a defendant in a related case.  In support of that effort, Mr. Katz participated in nearly *fifty* meetings with the government, totaling hundreds of hours, reviewed tens of thousands of files, and provided the government with truthful and complete information concerning the complex factual issues at the heart of the case and the inner workings of the conspiracy.  This information proved critically important not only to the government's investigation, but also to the prosecution of its case in court.  Mr. Katz took the stand and testified as a government witness at trial.  His detailed testimony on direct assisted the jury to navigate the complexities and nuances of the offense conduct, and he ably withstood hours of cross-examination.  Following his timely acceptance of responsibility, Mr. Katz's remarkable, sustained efforts as a cooperating witness over the span of several years, which were critical to the government's conviction of his co-conspirator at trial, warrant significant leniency.

 In addition to Mr. Katz's substantial cooperation with the government, his personal history and characteristics are compelling.  Prior to the offense conduct, Mr. Katz led a law-abiding life.  His participation in the charged conspiracy stands in stark contrast to every other aspect of his personal history and character both before and after this case.  Previously, Mr. Katz was a conscientious, productive member of society.  Moreover, he enjoyed a reputation as a good person, a generous and welcoming colleague, and a loving husband and devoted father.  Since pleading guilty and accepting responsibility for his wrongdoing, Mr. Katz has made strenuous, consistent efforts to make amends and redeem himself in the eyes of family and friends.  As the letters in support of his sentencing make clear, those who know him best describe Mr. Katz as a

1

good man, driven by an ethical desire to engage in purposeful activity, and as someone who puts family first.  Thus, over the course of his cooperation, Mr. Katz has become the primary caregiver for his two young children.  Before the outbreak of the coronavirus, he had come to occupy a place at the center of his children's lives, especially during their mother's frequent absence on business trips.  During the COVID-19 pandemic, Mr. Katz has also assumed primary responsibility for his children's education, as their stay-at-home teacher, guiding them through the challenges of remote learning and a socially-distanced childhood.  Mr. Katz's constant presence in the home has been a boon to his children during an especially unsettled and disorienting time.

For the reasons discussed below, under all of the circumstances of this case, in light of Mr. Katz's unique and compelling personal history and characteristics, and taking into account his extraordinary cooperation and the substantial assistance that he provided in support of the government's investigation and as a testifying witness at trial, we respectfully submit that a sentence of time-served, as recommended by the Probation Department, would be "sufficient, but not greater than necessary" to achieve the purposes of sentencing.  *See* 18 U.S.C. § 3553(a).

## FACTUAL BACKGROUND

### I.    Personal History and Characteristics

Jason Katz grew up in a suburban community in Detroit, Michigan with his parents and one sibling.  Presentence Report ("PSR") ¶ 64.  His parents provided a loving and supportive home, where he was raised in accordance with the values of his family's Jewish faith, in secure and financially stable circumstances.  *Id*. ¶¶ 64 - 65.  As a child, Mr. Katz played sports and his father coached his youth baseball team.  *Id*. ¶ 65.  Later, as a student at Birmingham Grove High School, he played baseball, basketball and football.  *Id*. ¶ 80.  After graduating from high school,

Mr. Katz moved to Ann Arbor to attend the University of Michigan, from which he graduated in 1996 with a bachelor's degree in business administration. *Id.* ¶¶ 79-80.

After graduating from college, Mr. Katz took his first job as a foreign exchange trader at ABN AMRO in Chicago, Illinois, where he was employed from 1996-1999. *Id.* ¶ 88. Subsequently, Mr. Katz took a job at Standard Chartered Bank, where he worked full-time as a currency trader from 1999 to 2001. *Id.* ¶ 87. From 2001-2010, Mr. Katz worked at Standard Bank as the head of the foreign exchange division of its New York branch. *Id.* ¶ 86. From June 2010 until June 2011, Mr. Katz worked at Barclays Capital as a director of currency trading. *Id.* ¶ 85. From September 2011 to July 2013, Mr. Katz worked at BNP Paribas as a director of currency trading. *Id.* ¶ 84. Mr. Katz then worked at ANZ in London, England from September 2013 to December 2016. *Id.* ¶ 83. Mr. Katz's position at ANZ was his last as a foreign exchange trader before he was charged in this case.

Mr. Katz excelled at and enjoyed his work. As a former colleague observed, Jason was a "very talented and skilled foreign exchange trader. He was simply very good at what he did and enjoyed doing it." Exhibit B (Letter of Jeffrey Angard) at 2; *see also* Exhibit O (Letter of Martin Long) at 1 (explaining that Jason was a "very sharp trader" and "very thorough and dedicated to performing well"). In addition to earning recognition for his acumen as a trader, he was praised and won promotions for his managerial skills. *See* Exhibit G (Letter of Lou Friedman) at 1 (explaining that Jason Katz "spearheaded" the rise of Standard Bank from a small niche bank to a respected professional emerging market bank).

His friends and former co-workers attest to the fact that, throughout his career, Mr. Katz was a supportive, caring, and kind colleague. *See* Exhibit F (Letter of Renita Fenwick) at 1 ("Mr. Katz was always someone who was very warm and friendly both at and outside of work.");

*see also* Exhibit W (Letter of John Wood) at 1 ("Jason went out of his way to help me settle in both at work and after hours" and was always happy to "lend an ear.").  He took it upon himself to provide a "support system" for colleagues who were new to his team, Exhibit F (Letter of Renita Fenwick) at 1, going "out of his way" to make others "feel welcome" and help them navigate a "highly competitive environment."  Exhibit B (Letter of Jeffrey Angard) at 1.  The letters in support of Mr. Katz include multiple examples of his efforts to support his colleagues at work.  When one of them was making the transition to the New York office from outside the area, Jason "took his personal time to show [her] around New York and provide guidance for [her] move."  Exhibit E (Letter of Ludmila Fabianova).  In another instance, Mr. Katz made sure that Ms. Fabianova, who was new to the foreign exchange team, was invited to a holiday dinner; indeed, Mr. Katz made a point of calling the restaurant himself to ensure that the intern was seated with the group, so that she would feel included as "an important part of the [trading] desk."  *Id.*

Mr. Katz was consistently there for his colleagues, always committing his time and energies to support them, especially in times of hardship.  For example, when a co-worker passed away in 2018 after a battle with cancer, Mr. Katz was "deeply impacted by his passing" as he had worked with him for years.  Exhibit F (Letter of Renita Fenwick) at 1.  Mr. Katz "stood out during this vulnerable time and showed his support to [the co-worker's] family and friends in various ways."  *Id*.  Mr. Katz's support for the family included launching an online fundraiser to ensure that his co-worker's daughter would have sufficient funds to pay her college tuition.  *See id*.; *see also* Exhibit W (Letter of John Wood) at 1 ("With his strong network of friends [Katz] was able to help raise a tidy sum for the young lady . . ."); Exhibit V (Letter of Billy Viljoen) at 1; Exhibit J (Letter of Monika Houser Boyle) at 1 ("Jason has always thought of others and

sought to help people in their time of need and this was just another example of Jason putting other's before himself.").

Indeed, his former colleagues describe Mr. Katz as the kind of person who treated his colleagues at work as if they were members of his own extended family. *See* Exhibit G (Letter of Lou Friedman) at 1 ("When Jason became head of foreign exchange, he placed a high priority on the team and went out of his way to make the whole desk a small family . . . When Jason got married, he invited almost the whole office because he believed that the office was his family."); *see also* Exhibit F (Letter of Renita Fenwick) at 1 (explaining that Jason "treated his co-workers as an extension of his family and was very much responsible for driving that culture in our team").

In 2001, Mr. Katz met his future wife, Sunil Sampson.  Mrs. Katz writes "Jason and I met nineteen years ago and I just knew that he was the one for me after 6 months of dating.  He was a kind, caring and driven individual just like me.  He was different than most other guys."  Exhibit L at 1.  Mrs. Katz further explains, "When we were dating, I was studying to get my master's at NYU and Jason himself was studying for his CFA.  He recognized the importance of my schooling and supported me.  Instead of dinners he would encourage study dates.  That was very important to me as he showed an interest in something that was so important to me.  He also shared the same view as me regarding family, love, children and career." *Id*.

Mrs. Katz credits Mr. Katz with helping her shift careers, writing "At the time we were dating . . . I was miserable in my job and looking for something new.  Jason helped me to get my role at the firm where I have now been for the past sixteen years" because Mr. Katz connected Mrs. Katz with her present boss and "spent hours prepping me and attended a dinner that was

part of my interview process.  By the time we had finished working together, I felt so confident that I could succeed."  *Id.*

The couple decided to marry and were wed on August 14, 2004.  *See* PSR ¶ 68.  Mrs. Katz ultimately advanced to a senior position with very significant responsibility as Head of Product Management for Europe, Middle East and Africa for a financial services network.  *See* Exhibit L at 1.  Mr. Katz has repeatedly expressed to friends that he feels lucky to have married Sunil; as he puts it, Mr. Katz is fortunate that his wife actually chose him as her husband.  *See* Exhibit N (Letter of Jennifer Lipford) at 1.  Despite the challenges posed by Mr. Katz's involvement in the offense conduct charged in this case, his marriage is strong.  Indeed, Mrs. Katz observes that marriage and family have remained the cornerstone of their relationship, and they still love each other after being married for fifteen years.  *See* Exhibit L at 1.

Mr. and Mrs. Katz's first child, ████, was born in 2008, and their second child, ████, was born in 2013.  *See* PSR ¶ 68.  Sunil describes her husband as a loving and devoted father, who has always played an active and significant role in their children's lives.  In her words, she explains "Jason has always been there to support ████, ████, and myself in anything that we have needed.  For us, family has always come first."  Exhibit L at 1.  Family friends also describe Mr. Katz as a "family man" who is devoted to his son and daughter.  *See* Exhibit C (Letter of Mark Ashcroft) ("Jason is a loving husband and a devoted father to ████ and ████.  He is a dedicated family man and we ask that you show leniency to Jason on behalf of his young family."); Exhibit F (Letter of Renita Fenwick) at 1 ("I also got to experience him becoming a father for the first time and he was extremely joyful and proud, and showed the importance he placed to family. He is very much a family man and makes his family accordingly depend on him."); Exhibit N (Letter of Jennifer Lipford) at 1 ("When [Jason] became a father, he was so

6

proud and often joked that he can't believe he had any part in creating such wonderful small humans. Watching Jason play with his kids (and mine) is a truly exhausting and hilarious situation."); Exhibit O (Letter of Martin Long) at 1 ("[Jason] has shown himself to be an excellent father and family man . . . it is very apparent they adore having him around."); Exhibit W (Letter of John Wood) at 2 ("Jason has a wonderful family and his wife and kids mean the world to him. I think the only time Jason has turned me down for a paddle match or a social get-together has been when his kids need his time or have an event. He will always choose his family first. I have attended many family functions and there is no doubting the love the kids and his wife have for Jason and that he has for them."); Exhibit T (Letter of Danielle Saunders) ("[Jason] may be one of the best husbands and fathers that I have ever met.").

Mr. Katz plays an integral role in the care of his young children. Mrs. Katz writes "[i]n the 3.5 years since Jason plead guilty, he has become the stay at home father for our children. I have seen so many things occur as a result of this." Exhibit L at 2. Mrs. Katz explains that "[h]aving a sense of religion is important to our family." *Id*. Mr. Katz is deeply involved in his son's preparation for his bar mitzvah May of next year, which requires rigorous study, now done at home due to the COVID-19 outbreak. *See id*. Mr. Katz also is involved in his son's recreational activities. ███ had "issues with coordination" due to Nystagmus which causes a fluttering of the eye and prevents ███ from seeing properly. *Id*. As a result, ███ felt "left out" of the sports scene in town. *Id*. Mr. Katz spent the last few years working with his son ███ "in the backyard and on the fields." *Id*. Mr. Katz coached spring and summer flag football every year so that he could make sure that ███ "was put in a position where he could succeed and gain confidence." *Id*. "Six seasons and two championships later ███ beams with pride

every time he looks at his trophies.  The pride he feels is because Jason was there to work and nurture him." *Id*.

During the time since he pled guilty, Mr. Katz, who took early education classes while living in London, put what he learned into practice with his daughter ███. *See id*.  Mrs. Katz explains "On the home front, our daughter ███, who came into nursery school with speech and emotional issues has blossomed.  The school thought we should enroll her in special classes, but Jason said let me work with her at home first before we make that determination.  Several years and countless hours later our daughter is a flourishing seven year old.  She is now a self-confident little girl whose present teacher was shocked that at one point there was talk of putting her in a different school tract.  She is bubbly and creative.  Her speech, math and reading ability has changed so dramatically you wouldn't think it was the same girl.  Jason is largely responsible for this." *Id.*

Mr. Katz has also played a major role in treating his children's severe nut allergies.  As a result of their allergies, Mr. Katz has had to rush each of his children to the hospital on separate occasions for emergency treatment after they suffered anaphylaxis because of something they had mistakenly eaten.  *See id.* at 1.  In those situations, "[a] parent has to be there to make very serious decisions that affect the care of the children."  *Id*.  ███'s reactions are so severe, that Mr. and Mrs. Katz have enrolled him in an immunotherapy regimen that "requires Jason to drive ███ to a clinic during the week to work on building up a tolerance to his hypersensitivity to peanuts.  This has to happen every couple of weeks."  *Id; see also* PSR ¶ 68.  "Without this treatment ███ is at much greater risk of a severe Anaphylactic reaction."  *See* Exhibit L at 2.  Mrs. Katz explains "It terrifies me to know what could happen if I was 14 hours away overseas and Jason wasn't there if another episode occurred.  In order to do my job, I am required to travel

8

extensively but without Jason, I may not be able to continue in my current role due to the

potential harm that could come to ███ and ███." *Id.*

Over the past several years, Mr. Katz has come to occupy a central place in the daily lives

of his children.  Now the primary breadwinner for their family, Mrs. Katz frequently travels for

work (at least pre-COVID), often for days at a time.  Mr. Katz is there for his son and daughter

when they get up in the morning, at mealtimes, after school, for recreational activities and at

bedtime.  With the outbreak of the COVID pandemic, and the advent of remote learning, Mr.

Katz has taken on an additional role – as his children's schoolteacher.  *See id.; see also* Exhibit

M (Letter of Deborah Lieberman).  Jason sits with his children for hours at a time, working on

their e-learning assignments and preparing them for the next day's lessons.  Mr. Katz's daughter

███ "love[s] every minute of it."  Exhibit L at 2.  Thus, as a result of the global coronavirus

pandemic, Mr. Katz has come to play an even more central and critical role in his children's

lives, as the family endeavors to confront the challenges of a socially-distanced community, in

which schoolhouses are only partially open and the focal point of children's education – indeed

of their entire world – is the home.  Mrs. Katz explains "[t]aking him away from us at this point

would devastate the family in a way that we will never recover.  He is the person that keeps

everything balanced.  By taking care of ███ and ███, he allows me to do what I need to do to

keep us afloat.  I have no way to take care of them on my own and still work in the job that is

keeping this family together.  I simply don't have the support structure without him." *Id.* at 3.

Although he is completely devoted to his children, Mr. Katz continues to seek, and find,

opportunities to improve the life of others.  In the words of Mrs. Katz, "Outside of the home

Jason hasn't let his issues stop him from trying to add to the community.  I know it hurts him not

to be working and part of a company." *Id.* at 2.  For example, during the pendency of this case,

he has remained active in his community, including a local charity that supports the Family and Children's Agency of Connecticut.  *See id.* at 3.  Mr. Katz "does everything from unloading the items for donation to helping run the electronics area" of the charity's main annual fundraising event, during which local residents donate items for sale.  *Id*.  In all, Mr. Katz has spent over two hundred hours working on the event during the past several years.  *See id*.

He also trained for four months as an Emergency Medical Technician, and has signed up to become a volunteer EMT in his town.  *See id*.  Two nights a week for four hours at a time over this period, Mr. Katz would come home from his ride-along trips and tell Mrs. Katz about his experiences learning to triage people in need of immediate medical care.  *See id*.  Mr. Katz was "so happy and proud."  *Id*.  Katz has been informed that he will become eligible to begin serving in this capacity upon the full completion of his sentence in this matter.  *See id*.  He looks forward to starting in this position and directly helping members of his community in times of critical need.

Although no longer able to earn a living in the financial markets, having forfeited that opportunity due to his involvement in the charged conduct in this case, Mr. Katz has continued to contribute to the family financially.  In recent years, he has begun managing he and his wife's rental properties.  PSR ¶ 82.  Though these properties are not yet producing substantial income, and notwithstanding the obstacles posed by the pandemic, Mr. Katz is committed to making that happen by devoting his energies to proper maintenance and marketing, and anticipates that the properties will become more profitable over time.

The consequences of forfeiting his career in the foreign exchange market have taken a severe toll on Mr. Katz, who was proud of his considerable professional achievements.  The emotional impact of confronting his wrongdoing, and living with the consequences of his

involvement in criminal activity, cannot be overstated.  *See* Exhibit G (Letter of Lou Friedman) at 1 (Mr. Katz was "emotionally crushed when he was charged."); Exhibit B (Letter of Jeffrey Angard) at 2 ("Jason lost one of the things he most loves; his ability to work in the finance world; to be an active member of the trading community and share his market views, skills and experience with others"); Exhibit J (Letter of Monika Houser Boyle) at 1 ("Jason has now lost his career, the thing that gave him drive and direction in his adult life.").  Yet, Mr. Katz has worked hard to make amends, not least of all by supporting the government's efforts as an extraordinary cooperating witness, but also by focusing his energies on his family, his community, and on starting a new chapter in his life centered on his family and his community. As Mr. Angard observed, "I also know Jason is willing to sacrifice . . . and start a whole new chapter in his life, where he can make a meaningful contribution to his community and of course his family."  Exhibit B at 2.

Mr. Katz's determination to make amends and turn his life around is consistent with traits of character that friends and family attest to in their letters of support.  *See* Exhibit M (Letter of Deborah Lieberman) ("Mr. Katz has demonstrated a strong determination to move past the situation in a constructive and successful manner.").  By way of example, it is clear that Mr. Katz has seized the opportunity to deepen his connection to his children, not just by spending time with them, but by playing a central and deeply supportive role in their lives as their primary day-to-day caregiver.  Jennifer Lipford, a close family friend, observes that "[h]is love for his family is strong and in spite of the trouble he's in, he has tried to make the most of the situation by spending all of his time with his kids.  He confessed to me that one bright spot through all of this is getting the chance to spend more time with his kids.  That's Jason again, finding joy wherever he can . . . I trust that no matter what comes, Jason will always find joy and share it."  Exhibit N

at 2.  Friends and family also attest to Mr. Katz's purposefulness.  He is not just trying to "turn the page"; rather, Mr. Katz is committed to making up for his wrongdoing, and to setting an example for his children.  As another family friend noted, Mr. Katz "acknowledges that his career, as he knew it, is over but wants to start fresh and build something that he can again be passionate about.  He wants to show his children, first hand, that a mistake does not need to define your life.  That one can rise above a mistake and move forward to continue to do good and serve a higher purpose."  Exhibit J (Letter of Monika Houser Boyle) at 1.  As these and other letters attest, even though Mr. Katz admitted to and accepted responsibility for engaging in criminal conduct, he is not defined by it.  To the contrary, he is now, as he has always been, motivated above all to find meaning and purpose in constructive, positive endeavors.  Indeed, close family friend Christina Acocella refers to Mr. Katz as the epitome of "positivity."  Exhibit A at 1.  Similarly, Danielle Saunders observes that "Jason has been and will always be a bright and positive person in our lives."  Exhibit T.  And Ashton Saunders echoes this sentiment: "During this difficult time, Jason has tried to stay positive, refocus his skills and continue to add value . . ."  Exhibit S.  These comments testify to the true nature of Mr. Katz, which is fundamentally not just law-abiding, but morally and ethically good.

Since pleading guilty, Mr. Katz's life has been marked by extreme remorse and shame.  To say that Mr. Katz regrets the decisions that resulted to his indictment and guilty plea in this case would be a gross understatement.  Numerous friends have observed Mr. Katz's profound remorse at engaging in criminal conduct.  *See* Exhibit U (Letter of Shaun Tamarozzi) at 1 ("For the last couple of years when talking or hanging out with Jason he has tried hard to be his positive self but there is no doubt that he harbors deep regret and most of all concern for his family and how he has let them down."); Exhibit G (Letter of Lou Friedman) at 1-2 ("[Jason] has

spent a lot of time alone with his thoughts for years and I believe he is regretful and wishes beyond anything else that this could have been avoided.  He is truly remorseful."); Exhibit C (Letter of Mark Ashcroft) ("We know that Jason is remorseful and regrets the events that have led to this situation."); Exhibit F (Letter of Renita Fenwick) at 2 ("Mr. Katz is very remorseful and regrets his involvement in this conduct that has given rise to this case."); Exhibit N (Letter of Jennifer Lipford) at 2 ("He is disappointed in himself and regrets putting his family through it all . . ."); Exhibit E (Letter of Ludmila Fabianova) ("I know the last few years have been extremely difficult for Jason and he regretted his behavior on many occasions."); Exhibit P (Letter of Veda Milin) ("I know Mr. Katz is regretful for the charges against him.  He wishes very deeply there will be no pain to his wife and children."); Exhibit O (Letter of Martin Long) at 2 ("Jason regrets sincerely his involvement in this matter brought against him, he has expressed remorse many times in conversations we have had over the last couple of years. . ."); Exhibit J (Letter of Monika Houser Boyle) at 1 ("[Katz] is deeply regretful of his conduct and would like nothing more than to move forward with his life."); Exhibit Q (Letter of Reza Moledina) at 2 ("I know that Jason deeply regrets what has gone on. The events of the last few years have changed him in words which I cannot describe. His biggest concern wasn't for himself but for his family. I am sure if he could turn the clock back he would as he deeply regrets his actions.").  Mr. Katz's wife writes: "Honorable Judge Koeltl, I am begging you with all of my heart to let Jason come home.  I have seen the remorse in Jason, and I have seen how hard he worked at making amends. I have watched the toll that this has taken on him as he has spent hour after hour trying to put things right by working over several years with the government."  Exhibit L at 3.

With Sunil Katz's position requiring frequent international travel, the need for childcare of the Katz's two children, and the added burden of remote learning for the Katz's children, Mr. Katz's friends and family worry about the devastating impact of any period of incarceration requiring Mr. Katz to be separated from his family. *See id.*; *see also* Exhibit K (Letter of Karen Katz) at 1-2; Exhibit G (Letter of Lou Friedman) at 2; Exhibit C (Letter of Mark Ashcroft); Exhibit V (Letter of Billy Viljoen) at 2; Exhibit R (Letter of Alberto Nunez); Exhibit M (Letter of Deborah Lieberman); Exhibit O (Letter of Martin Long) at 2; Exhibit B (Letter of Jeffrey Angard) at 2; Exhibit T (Letter of Danielle Saunders); Exhibit H (Letter of James Gavilan). Due to age and health concerns, Mr. Katz's parents could not substitute as the childcare for the Katz children. *See* Exhibit K (Letter of Karen Katz) at 2.

## II.      Charges and Plea Allocution

On December 19, 2016, Mr. Katz agreed to waive indictment and plead guilty to a one-count Information, in which he was charged with knowingly entering into and engaging in a combination and conspiracy to suppress and eliminate competition by fixing prices for Central and Eastern European, Middle Eastern, and African Emerging Markets currencies ("CEEMEA" currencies) from at least as early as January 2007, and continuing until at least July 2013, in violation of Section One of the Sherman Antitrust Act, 15 U.S.C. § 1. On January 4, 2017, Mr. Katz pled guilty pursuant to that agreement.

## III.     Mr. Katz's Extraordinary Cooperation with the Government

Since pleading guilty pursuant to a cooperation agreement in 2016, Mr. Katz has been actively cooperating with the Government in this case. As reflected in the PSR, Mr. Katz met with the government approximately fifty times. During these debriefing sessions, many of which lasted for several hours, Mr. Katz provided complete, accurate and truthful information that was

essential to the government's understanding of the complexities and nuances of the foreign exchange market, how foreign exchange traders work and communicate, and the inner workings of the charged conspiracy.  PSR at 25-26.  In connection with his multi-year cooperation, Mr. Katz reviewed tens of thousands of audio files, chat communications, trading data files, identifying key materials and elucidating them for the government.  *Id.*

As noted in the PSR, Mr. Katz's cooperation spanned a period of over three years, during which time he was fully forthcoming and committed to assisting the government to the best of his abilities.  Thus, in addition to traveling regularly to meet with the government from his home in Connecticut, and committing substantial time and effort on his own reviewing and analyzing documents and materials at the government's direction, Mr. Katz also prepared for and testified at the trial of Akshay Aiyer.  His direct testimony was important to the jury's understanding of the foreign exchange industry, the functioning of the currency markets, the proper conduct of traders operating in those markets, and the manipulation of that market by the co-conspirators who had been charged in the case, including Mr. Aiyer.  In particular, Mr. Katz's testimony assisted the jury to understand the trading data and chat communications at the heart of the government's case against Mr. Aiyer.  Mr. Katz ably withstood sustained cross-examination at trial, sustaining his credibility before the jury in the face of sustained attack.  Moreover, during the course of the trial Mr. Katz advised and supported the government's efforts in multiple debriefings and strategy sessions unrelated to his preparation for testifying on direct and cross, which proved valuable to the government's presentation of its case to the jury, including on summation.  As Probation notes, "the Government considers [Mr.] Katz's cooperation to be an essential part of the case against [Mr.] Aiyer, which resulted in [Mr.] Aiyer's subsequent

15

conviction." PSR at 25. The PSR further notes that Mr. Katz's assistance was "commendable and holds significant weight." PSR at 26.

## IV.    Guidelines Calculation and Probation's Recommendation of Time-Served

As set forth in the PSR, the following provisions of the U.S. Sentencing Guidelines apply:

- Pursuant to 15 U.S.S.G. § 2R1.1(a), the base offense level is 12.

- Pursuant to 15 U.S.S.G. § 2R1.1(b)(1), one level is added due to the submission of non-competitive bids as part of the offense conduct.

- Pursuant to U.S.S.G. § 2R1.1(b)(2)(D), eight levels are added for a volume of commerce of approximately $232,736,862.

- Pursuant to U.S.S.G. § 3E1.1(a), the offense level is decreased by two levels as a result of Mr. Katz's acceptance of responsibility.

- Pursuant to U.S.S.G. § 3E1.1(b), the offense level is decreased by one additional level as a result of Mr. Katz's assistance in the investigation or prosecution of his own misconduct.

On the basis of these calculations, the total offense level is 18. Mr. Katz has no criminal history points, and consequently, his Criminal History Category is I. Accordingly, Mr. Katz's Sentencing Guidelines range is 27-33 months.

However, the Probation Department recommends a substantial variance from the Guidelines range. Based upon Mr. Katz's personal history and characteristics, his lack of any prior criminal history, and in particular taking into account his extraordinary cooperation and the "substantial assistance" that he provided to the government in connection with its investigation and as a witness at the trial of Mr. Aiyer, the Probation Department recommends a sentence of time served.

16

## ARGUMENT

**I.      Legal Standard**

Section 3553(a) of Title 18 provides that "[t]he court shall in every case impose a sentence sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of this subsection."  18 U.S.C. § 3553(a).  Among the factors to be considered under § 3553(a) are (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, and (3) "the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from future crimes of the defendant."  18 U.S.C. § 3553(a).

As the Supreme Court reaffirmed in *Pepper v. United States*, the sentencing judge must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." 562 U.S. 476, 487 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). While the Guidelines are the "starting point and the initial benchmark," the Court "may not presume that the Guidelines range is reasonable."  *Gall v. United States*, 552 U.S. 38, 49–50 (2007).  Rather, the sentencing court must make an "individualized assessment" of the sentence warranted by § 3553(a) "based on the facts presented." *Gall*, 552 U.S. at 50; *United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014). Thus, in addition to the Guidelines, courts are also required to consider a variety of other factors set forth in § 3553(a), including the "nature and circumstances of the offense" and the "history and personal characteristics of the defendant." 18 U.S.C. § 3553(a)(1) (2012).

Indeed, the Supreme Court has "emphasized that '[h]ighly relevant – if not essential – to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'" *Pepper*, 562 U.S. at 487–88 (citations omitted) (alterations in original).  Ultimately, as the Second Circuit has recently instructed, "a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (internal quotation marks omitted).

## II.   The § 3553(a) Factors Support Probation's Recommended Sentence of Time-Served

Although Mr. Katz does not object to Probation's calculation of the applicable Guidelines range in this case, we believe that range in part overstates Mr. Katz's culpability and, in any event, should not apply given Mr. Katz's extraordinary cooperation and the "substantial assistance" he provided to the government over a period of more than three years and as a government witness at the trial of Mr. Aiyer.  Under the particular circumstances of this case, and in light of well-settled principles establishing that a cooperating witness's substantial assistance in the investigation and prosecution of other wrongdoers warrants leniency, Probation's recommended below-Guidelines sentence of time-served is clearly appropriate and sufficient to accomplish the goals of the federal sentencing statute.  *See, e.g.*, *Gall*, 552 U.S. at 50 (holding that sentencing judge "may not presume that the Guidelines range is reasonable").

### A.   Mr. Katz's Extraordinary Cooperation Merits Leniency

Mr. Katz acknowledges and accepts that his offense was undoubtedly serious.  But the nature and circumstances of that offense must be balanced against his extraordinary cooperation. As noted, Mr. Katz pleaded guilty and accepted responsibility for his wrongdoing over three years ago and has been cooperating with the government ever since.  During that time, Mr. Katz

met with the government approximately fifty times, and spent countless additional hours reviewing and analyzing materials at the government's direction. Separate and apart from his efforts at the government's express direction, Mr. Katz committed time and attention to this matter on his own, thinking through issues that arose during his debriefing sessions on his own time, so that he would be better prepared to help the government investigate and present its case at trial. Mr. Katz's efforts leading up to and at the trial were especially intense, as he prepared to translate his own experience, including his detailed understanding of abstruse foreign exchange trading concepts and the inner workings of the conspiracy to a jury from the witness stand – and to withstand sustained cross-examination – an challenging task unlike anything he had experienced before. Mr. Katz guided the jury through complicated foreign exchange transactions and elucidated the co-conspirators' coded chat communications, and maintained his composure and credibility in the face of sustained cross-examination. As one of only two cooperating witnesses to testify at trial, Mr. Katz's assistance was critical to the success of the government's case. As acknowledged in the PSR, Mr. Katz's cooperation is "commendable and holds significant weight." PSR at 26. Indeed, the Government considers Mr. Katz's cooperation to have been an "essential" part of the case against Akshay Aiyer. PSR at 25. It bears noting that, even as he was preparing for and testifying at trial, Mr. Katz remained attentive to his family's needs, often traveling home to Connecticut after long meetings.

## B.   Mr. Katz Has Already Suffered Serious Punishment for His Actions

As a result of this case, Mr. Katz forfeited everything that he had worked for and accomplished over the course of a 24-year career as a foreign exchange trader. And he lost his certification as a Chartered Financial Analyst ("CFA") – a certification he obtained in 2004 after completing a rigorous, three-year course of study. PSR, ¶ 81. As discussed above, Mr. Katz was

recognized by his peers as a talented currency trader.  *See* Exhibit O (Letter of Martin Long) at 1 (explaining that Jason was a "very sharp trader" and "very thorough and dedicated to performing well"); Exhibit B (Letter of Jeffrey Angard at 2 (Mr. Katz was "very talented and skilled foreign exchange trader.  He was simply very good at what he did and enjoyed doing it.").  The loss of his career, which he excelled at and from which he derived tremendous personal and professional satisfaction, was crushing to Mr. Katz.

It was also devastating because Mr. Katz cared deeply about his colleagues, whom he thought of and treated as extended family.  *See* Exhibit W (Letter of John Wood) at 1 (Mr. Katz went out of his way to help Mr. Wood "settle in" and was always happy to "lend an ear."); Exhibit F (Letter of Renita Fenwick) at 1 (Mr. Katz provided a "support system" and treated his co-workers as an "extension of his family"); Exhibit B (Letter of Jeffrey Angard) at 1 (Mr. Katz went out of his way to make others "feel welcome"); Exhibit G (Letter of Lou Friedman) at 1 (when Mr. Katz got married, he "almost invited the whole office because he believed that the was his family").  In short, the loss of his career and all that it meant for him professionally and personally was crushing.  *See* Exhibit B (Letter of Jeffrey Angard) at 2 ("Jason lost one of the things he most loves; his ability to work in the finance world; to be an active member of the trading community and share his market views, skills and experience with others . . .); Exhibit J (Letter of Monika Houser Boyle) at 1 ("Jason has now lost his career, the thing that gave him drive and direction in his adult life. The sense of purpose that propelled him forward has been lost.").

Despite these circumstances, Mr. Katz is committed to making amends for his wrongdoing and redeeming himself in the eyes of friends, family and his community.  *See* Exhibit L (Letter of Sunil Katz) at 2-3.  As noted, those who know him best have always been

impressed by his steadfast devotion to his wife and children.  *See* Exhibit C (Letter of Mark Ashcroft) ; Exhibit F (Letter of Renita Fenwick) at 1; Exhibit N (Letter of Jennifer Lipford) at 1; Exhibit O (Letter of Martin Long) at 1; Exhibit W (Letter of John Wood) at 2; Exhibit T (Letter of Danielle Saunders).  And he is committed to finding meaning and purpose, including through service to his community.  *See* Exhibit L (Letter of Sunil Katz) at 2-3.  These deep commitments to family and community, buttressed by his strong moral compass and commitment to find meaningful engagement as part of a purpose-driven life, demonstrate that Mr. Katz is fully capable of rehabilitation without need for an incarceratory sentence.

Consideration of "collateral consequences," such as Mr. Katz's forfeiture of his ability to earn a living in the profession in which he had invested over two decades, bear upon "the concept of 'just punishment'" and are appropriate for the Court to consider in fashioning a just sentence under § 3553(a).  *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (finding it was proper for district court to consider collateral effects of a particular sentence, including effect on defendant's desired career).

### C.    The Need for Specific and General Deterrence Weighs Against Imposition of an Incarceratory Sentence

Mr. Katz poses no risk of re-offending.  Indeed, Mr. Katz is a first-time offender (PSR, ¶ 56) and the offense conduct represents an aberration from his generally law-abiding life.  *See also United States v. Mullings*, 131 F. Supp. 3d 1, 4 (E.D.N.Y. 2015) (custodial sentence unnecessary in part because conduct appeared to be aberration from otherwise law-abiding life).  Even so, this case has been a wake-up call for him.  Above all, Mr. Katz recognizes that he made a terrible mistake and that his mistake has already carried serious consequences.  *See supra*, Section I.  Not only has Mr. Katz expressed severe remorse, his years of truthful cooperation

21

with the government's investigation and his willingness to do whatever the Government required of him, serves as proof of his reform.

Additionally, Mr. Katz has lost his livelihood (and reputation in the industry) as a result of this case and cannot return to work in the financial industry, making his potential to commit this type of crime again nonexistent.  *United States v. Emmenegger,* 329 F. Supp. 2d 416, 428 (S.D.N.Y. 2004); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994); *United States v. Gupta,* 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014).  Moreover, on his own accord, Mr. Katz has already accepted that his career in foreign exchange is over and he is actively pursuing new ways to add value at home and in the community.

In addition to specific deterrence, the Court must also consider the need for general deterrence.  *See* 18 U.S.C. § 3553(a)(2)(B).  This factor also weighs in favor of a lenient sentence because, in considering the goal of general deterrence, "[t]he court has the responsibility for designing a sentence that encourages cooperation with law enforcement. The sentence must not be so harsh that it discourages the defendant or [others] from coming forward and assisting the government in the future."  *United States v. Doe*, 323 F. Supp. 3d 368, 390 (E.D.N.Y. 2018).  In addition, given the public nature of Mr. Aiyer's trial, further general deterrence is not necessary, as others in the industry are well-aware of the consequences of the offense conduct at issue.

D.     **A Sentence of Time-Served Is Necessary to Avoid Unwarranted Sentencing Disparities Across Similar Cases**

Finally, a sentence of time served is warranted to avoid "unwarranted sentencing disparities" among similar cases.  *See* 18 U.S.C. § 3553(a)(6).  The "primary purpose" of this provision is "to reduce unwarranted sentence disparities nationwide," though the Second Circuit has approved a sentencing judge's "consideration of similarities and differences among

codefendants when imposing a sentence." *United States v. Wills*, 476 F.3d 103, 109–10 (2d Cir. 2007).

In other Sherman Act violation cases in the Southern District of New York, courts have repeatedly imposed non-custodial sentences, particularly for defendants who have pled guilty and accepted responsibility. *See e.g.* Judgment In a Criminal Case, Dkt. 34, *United States v. Edward Savarese*, 05-CR-516 (GEL); *see also* Judgment In a Criminal Case, Dkt. 18, *United States v Anthony Spadola*, 06-cr-898 (LMM); *see also* Judgment In a Criminal Case, Dkt. 12, *United States v. Lori Montgomery*, 02-cr-1308 (TPG).

Moreover, in this case, Mr. Aiyer, who did not plead guilty or accept responsibility, was sentenced to eight months in custody and two years of supervised release. By contrast, Mr. Katz promptly accepted responsibility for his actions and provided substantial assistance to the Government's investigation. Given the nature and extent of Mr. Katz's cooperation, his sentence should be significantly lower than Mr. Aiyer's sentence.

Accordingly, a non-custodial sentence for Mr. Katz is necessary to avoid sentencing disparities across similar cases for the same conduct at issue in this case.

## **CONCLUSION**

For the foregoing reasons, we respectfully request that the Court impose a sentence of time served in recognition of Mr. Jason Katz's substantial cooperation with the Government. Under the circumstances of this case, such a sentence will be sufficient to satisfy all the purposes of sentencing and is appropriate under § 18 U.S.C. § 3553(a).

Dated: New York, New York
         September 17, 2020

SHER TREMONTE LLP

By:  /s/ Michael Tremonte
        Michael Tremonte
        Robert Knuts
        Allegra Noonan
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
E-mail: mtremonte@shertremonte.com
*Attorneys for Defendant Jason Katz*