# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :
UNITED STATES OF AMERICA            :
                                    :
                   v.               :        No. 17-cr-003 (JGK)
                                    :
                                    :
JASON KATZ,                         :
                                    :
                   Defendant.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# UNITED STATES' SENTENCING MEMORANDUM REGARDING
# DEFENDANT JASON KATZ

## TABLE OF CONTENTS

I.  The Nature and Circumstances of the Offense .................................................................. 2

II.  Katz's History and Characteristics...................................................................................... 3

III.  Katz's Sentencing Guidelines Calculations and Sentencing Range .................................... 4

IV.  A Substantial Fine is Warranted for Katz ........................................................................... 5

i

# **TABLE OF AUTHORITIES**

**Federal Statutes**

15 U.S.C. § 1 .................................................................................................................... 1
18 U.S.C. § 3553(a)(1)-(7) ............................................................................................... 4
18 U.S.C. § 3571(b) .......................................................................................................... 5
18 U.S.C. § 3663A(c)(3)……………………………………………………………………..5

On January 4, 2017, Defendant Jason Katz ("Katz") pled guilty to one count of violating the Sherman Act, 15 United States Code § 1, by conspiring with Akshay Aiyer, Christopher Cummins, and Nicholas Williams—all of whom specialized in Central and Eastern European, Middle Eastern, and African Emerging Markets currencies ("CEEMEA" currencies)—to suppress and eliminate competition for the purchase and sale of the CEEMEA currencies by fixing the prices of those currencies when they were exchanged for dollars or euros in the United States and elsewhere.

The Foreign Exchange market is the largest financial market in the world and serves as the engine for international trade and commerce. The co-conspirators implemented their conspiracy primarily by rigging bids to customers who came to them for price quotes, and by coordinating the timing, submission, and prices at which they placed bids and offers on the Reuters trading platform in an effort to raise or lower prices to their benefit. (*See* ECF No. 221 2-8, 1:18-cr-333 (JGK)). When they implemented this agreement, the co-conspirators stole from pension funds, college saving funds, foundations, mutual funds, and retirement accounts.

Instead of competing, these traders worked together, as Katz explained at trial, to make more money, or to lose less money, on certain trades than would otherwise have been the case: "It allowed for opportunities to make more money than if we were acting purely alone, and it allowed opportunities to lose less money, you know, if the market went against you than if we were just dealing alone[.]" *See United States v. Akshay Aiyer* Trial Transcript ("Tr.") 864:16-20; *see also* Tr. 903:20-24; 914:5-10; 916:6-10. They were able to do so because, as Katz testified, "when Europe goes home, it's just New York, and we're bigger fish in a smaller market, you

know, that's our time to, you know, go back to manipulating the market around and moving it in ways that we want it to go."  Tr. 872:16-19; *see also* Tr. 874:6-15.

I.  <u>The Nature and Circumstances of the Offense</u>

Katz's agreement to fix prices for CEEMEA currencies was brazen and deceitful.  The conduct flowing from that agreement undermined the integrity of the Foreign Exchange market. Moreover, Katz was relatively well off at the time he entered into the charged agreement to suppress and eliminate competition.  As Katz acknowledged at trial, greed motivated him and his co-conspirators.  "Q:  Why did you enter into the agreement with [Mr. Aiyer], Mr. Cummins, and Mr. Williams?  A:  To make more money."  Tr. 862:3-5.

A trader's annual bonus, as explained by Cummins at trial, was based on many "soft" factors but "at the end of the day it came down to profitability."  Tr. 621:11-20.  This relationship between a trader's compensation and net profit was also alluded to in Defendant Aiyer's Sentencing Memorandum: "[Aiyer's] annual compensation was somewhat in excess of $1 million, or about 5% of the net income he generated for JP Morgan" (*See* ECF No. 220 at 22, n.6).  By working together as a team, instead of competing, Katz and his co-conspirators believed they could all make more money, or at least lose less money, at the expense of their customers and other market participants.

Both Katz and Cummins gave extensive testimony at trial about how this opportunistic agreement was implemented.  The government's Sentencing Memorandum for Aiyer highlighted many instances of fixing prices, as well as instances of bid rigging, and section I is hereby incorporated by reference.  (*See* ECF No. 221 at 2-8).

2

As Katz explained, by working as a team instead of competing, the CEEMEA currency traders at four of New York's largest banks could collude on the prices charged to customers and coordinate to manipulate supply and demand to their benefit on the Reuters trading platform.  Tr. 891-892.  With regard to customers, Katz testified that he understood that they were comparison shopping, hoping to get independent and competitive prices from different banks, so that they could get the best price.  *See*, *e.g.*, Tr. 936:6-12.  Katz also testified about knowingly deceiving the market by placing sham trades that were canceled in private.  Tr. 853-854.

II.    Katz's History and Characteristics

After receiving a bachelor's degree in business administration from the University of Michigan in 1996, Katz joined ABN-AMRO bank in downtown Chicago where he worked as a currency trader until that office was closed in 1999.  Katz then joined Standard Chartered Bank in New York, where he continued to trade Emerging Markets currencies.  In 2001, Katz left for Standard Bank, also in New York, and it was here that Katz developed skill in trading the South African rand ("ZAR") against the dollar ("USD") (Tr. 827:8-13), and built a network of other Emerging Markets currency traders.  Katz was eventually promoted to the head of Foreign Exchange trading and sales before resigning in 2010.

Katz then found employment with Barclays Capital, also in New York.  Much of Katz's testimony related to his time as a senior CEEMEA currency trader at Barclays, and his subsequent employment as a currency trader by BNP Paribas, beginning in September 2011, and continuing through approximately July, 2013.  Katz was hired by BNP Paribas to expand its New York market presence in CEEMEA currencies.

3

III.   <u>Katz's Sentencing Guidelines Calculations and Sentencing Range</u>

Much of the Sentencing Guidelines analysis for Katz is the same as set out by the government in its Sentencing Memorandum for Aiyer.  Accordingly, the government incorporates by reference section II. A., C., and D. 1-3. of that memorandum (*See* ECF No. 221, 1:18-cr-333 (JGK)), which discusses the applicable law, the seven factors outlined in Title 18, United States Code, § 3553(a)(1)-(7), the kinds of sentences available, and the volume-of-commerce calculation methodology.  18 U.S.C. § 3553(a).

For Katz's volume-of-commerce calculation, the government adopts the same methodology as applied to Aiyer, with the addition of certain episodes of similar conduct prior to 2010 that involved Katz.  The government has excluded instances that exclusively involved "spoofing" conduct or fake trades as it did for Aiyer, which were subject to a limiting instruction by the Court.  *See* Tr. 2142:16–2143:1.

Accordingly, the government considered only the following dates and affected currency pairs in its calculation of Katz's attributable volume of commerce:  February 20, 2007 (USD/ZAR); May 14, 2007 (USD/ZAR); January 23, 2009 (USD/TRY); September 9, 2010 (USD/ZAR); September 29, 2010 (USD/ZAR); October 14, 2010 (USD/RUB); October 15, 2010 (USD/TRY); November 15, 2010 (USD/ZAR); December 31, 2010 (EUR/RON); December 21, 2011 (USD/TRY); January 18, 2012 (USD/ZAR); January 27, 2012 (USD/ILS); September 10, 2012 (USD/ZAR); May 20, 2013 (EUR/CZK), (USD/TRY) (*See* Gov't Ex. A)[1].

---

[1]  In the government's Sentencing Memorandum for Aiyer (*See* ECF No. 221-1 "Exhibit A"), it attached summary exhibits which included dates relevant to Katz's volume-of-commerce calculation that are hereby incorporated by reference as to: 10/14/2010; 12/21/2011; 01/18/2012; 01/27/2012; 09/10/2012; and 05/20/2013.

4

The government submits that Katz's total offense level is 18, as set forth in the Presentence Report, representing a base offense level of 12 under §2R1.1(a); a specific offense characteristics addition of one level for bid rigging pursuant to 2R1.1(b)(1), an addition of eight levels due to the volume of commerce attributable to Katz, which was approximately $232,736,862, *see* 2R1.1(b)(2)(D), for an adjusted offense level of 21, prior to any adjustments for acceptance of responsibility. Under §3E1.1(a) & (b), Katz, by demonstrating acceptance of responsibility and by providing timely assistance to the government in its investigation and prosecution of others, qualifies for an offense level decrease of three levels, for a total level of 18. Katz's Criminal History category is I, and the resulting Sentencing Guidelines imprisonment range is 27-33 months.

The government is separately submitting a letter to the Court pursuant to Section 5K1.1 of the United States Sentencing Guidelines to set forth the details of the substantial assistance Katz provided to the government in its investigation and prosecution of others for price fixing and bid rigging in the Foreign Exchange market.

IV.   A Substantial Fine is Warranted for Katz

For the same reasons stated in the government's Sentencing Memorandum for Aiyer at II. G. (ECF No. 221), the government does not seek restitution from Katz. *See* 18 U.S.C. § 3663A(c)(3). However, as reflected in the PSR, Katz has the means to pay a fine. PSR ¶ 94. The applicable fine range is $20,000 to $1,000,000. PSR ¶ 103; U.S.S.G. §5E1.2(c)(3), (c)(4) and (h)(1); 18 U.S.C. § 3571(b). The applicable Guidelines commentary explains that "[s]ubstantial fines are an essential part of the sentence." U.S.S.G. §2R1.1, cmt. Background. In light of Katz's economic motivations and the need for general deterrence for others who might

5

engage in a similar cost-benefit analysis, the government respectfully submits that imposition of

a substantial fine is appropriate.

Dated:  New York, NY
        September 23, 2020

                                              Respectfully submitted,

                                              /s/ Eric Hoffmann

                                              Kevin Hart
                                              Eric Hoffmann
                                              U.S. Department of Justice,
                                              Antitrust Division
                                              New York Office
                                              26 Federal Plaza, Room 3630
                                              New York, NY 10278
                                              212-824-1346

cc:     Robert Knuts, Esq.
        Michael Tremonte, Esq.
        Allegra Noonan, Esq.
        *Counsel for Jason Katz*
        (by email)

**Exhibit A**

| DATES | CURRENCY PAIR | USD Amount | Time Period (UTC) | Conduct Description | Relevant Communication or Trial Exhibit |
|---|---|---|---|---|---|
| 02/20/07 | USD/ZAR | $5,000,000 | 16:59-17:02 UTC | Fix coordination | Citi-FX_DOJ_00095167 |
| 03/05/07 | USD/TRY | $0 | 17:04-17:06 UTC | Fix coordination | Citi-FX_DOJ_00095903-05 |
| 04/23/07 | USD/ZAR | $0 | 18:58-19:02 UTC | Fix coordination | Citi-FX_DOJ_00098847-48 |
| 05/14/07 | USD/ZAR | $1,000,000 | 18:58-19:02 UTC | Fix coordination | Citi-FX_DOJ_00100072 |
| 05/23/07 | USD/ZAR | $0 | 19:49-21:48 UTC | Fix coordination | Citi-FX_DOJ_00100633 |
| 01/23/09 | USD/TRY | $2,000,000 | 19:32-19:37 UTC | Coordinated trading | Citi-FX_DOJ_00124130 |
| 01/26/09 | USD/ZAR | $0 | 20:28-20:30; 20:40-20:41 UTC | Customer | Citi-FX_DOJ_00124207-08 |
| 05/25/10 | USD/ZAR | $0 | 15:08-15:10 UTC | Coordinated trading | STAND00008892-94 |
| 09/09/10 | USD/ZAR | $2,500,000 | 17:25-17:32 UTC | Coordinated trading | BARC-FX_00283143 |
| 09/29/10 | USD/ZAR | $57,500,000 | 14:59-15:06 UTC | Fix coordination | BARC-FX_00283157 |
| 10/14/10 | USD/RUB | $10,996,710 | see summary exhibit | Customer | GX-S01 |
| 10/15/10 | USD/TRY | $42,500,000 | 18:17-20:10 UTC | Coordinated trading | BARC-FX_01119907-11 |
| 11/15/10 | USD/ZAR | $21,500,000 | 20:39-20:46 UTC | Coordinated trading | BARC-FX_00283177 |
| 12/31/10 | EUR/RON | $42,784,000 | 13:08-13:29 UTC | Fix coordination | BARC-FX_00283211 |
| 11/04/10 | USD/RUB | $0 | see summary exhibit | Customer | GX-S02 |
| 04/20/11 | USD/TRY | n/a | see summary exhibit | Fake trade | GX-S03 |
| 04/26/11 | EUR/HUF | n/a | see summary exhibit | Fake trade | GX-S04 |
| 11/22/11 | USD/RUB | $0 | see summary exhibit | Customer | GX-S10 |
| 12/21/11 | USD/TRY | $12,000,000 | see summary exhibit | Coordinated trading | GX-S11 |
| 01/18/12 | USD/ZAR | $14,500,000 | see summary exhibit | Stop-loss | GX-S12 |
| 01/27/12 | USD/ILS | $6,000,000 | see summary exhibit | Fix coordination | GX-S37 |
| 03/08/12 | USD/TRY; EUR/TRY | $0 | see summary exhibit | Customer | GX-S19 |
| 09/10/12 | USD/ZAR | $10,163,042 | see summary exhibit | Coordinated trading | GX-S23 |
| 05/20/13 | EUR/CZK | $1,300,000 | see summary exhibit | Coordinated trading | GX-S28 |
| 05/20/13 | USD/TRY | $2,993,110 | see summary exhibit | Coordinated trading | GX-S29 |
| | Total attributable VOC | $232,736,862 | | | |